**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Prayer Feather Farrow</u>

      **v.**                                      **Civil No. 02-567-PB**

<u>Phil Stanley, et al.</u>

**<u>MEMORANDUM AND ORDER</u>**

*Pro se* plaintiff Prayer Feather Farrow is serving a life sentence at the Northern New Hampshire Correctional Facility ("NCF").  In December 2002, he filed suit alleging that several state officials[1] are denying him his right to practice his religion in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et. seq.* ("RLUIPA"), the First Amendment's Free Exercise Clause, and the Fourteenth Amendment's Equal Protection Clause.  The defendants have responded with a motion for summary judgment.

---

[1]  The named defendants are Phil Stanley, former commissioner of the Department of Corrections; Bruce Cattell, NCF Warden; Susan L. Young, NCF Administrator of Programs; and John Vinson, Esq., Staff Attorney for the Department of Corrections.

## I.  **PROCEDURAL HISTORY**

Farrow filed his complaint on December 11, 2002.  He seeks: (1) a declaration stating that defendants are violating his statutory and constitutional rights to practice his religion; (2) an injunction ordering defendants to grant the various requests enumerated in his complaint; and (3) compensatory damages.[2]

On September 4, 2003, Farrow filed a motion for a temporary restraining order and for preliminary injunction (Doc. No. 8). Defendants timely filed and served their objection on September 19, 2003 (Doc. No. 11).  On October 16, 2003, Magistrate Judge Muirhead held a hearing on Farrow's motion.  Farrow testified on his own behalf and the defendants offered the testimony of Defendant Cattell, Defendant Young and DOC Chaplain Michael Shaulis.  On February 5, 2004, the Magistrate Judge issued his Report and Recommendation (Doc. No. 19), recommending that Farrow's motion be denied.  I approved the Report and Recommendation on March 5, 2004.  Defendants' motion for summary

---

[2]  As to each of his claims, Farrow alleges, and defendants do not contest, that he has exhausted the administrative grievance procedures available to him within the prison system.

judgment (Doc. No. 24) followed on June 1, 2004.[3]

## II. **BACKGROUND**[4]

Farrow, a practicing member of the Lakota Sioux Nation and the Native American Sacred Circle ("Sacred Circle"), is incarcerated at NCF, the Department of Corrections ("DOC") facility located in Berlin, New Hampshire.  He claims that defendants are depriving him of his statutory and constitutional rights to practice his religion by: (1) preventing him from possessing tobacco for prayer and ceremonial use; (2) denying him access to medicines and herbs for ceremonial use; (3) prohibiting him from engaging in daily group prayer with other members of the Sacred Circle; (4) failing to supply him with Native American foods on religious holidays; (5) refusing to allow him to wear

---

[3]  I thereafter stayed the case until the Supreme Court determined in Cutter v. Wilkinson, 175 S.Ct. 2113 (2005), that RLUIPA did not violate the First Amendment's Establishment Clause.

[4]  For the purpose of this Memorandum and Order, I consider all exhibits submitted with the parties' summary judgment papers, as well as the transcript and exhibits from the October 16, 2003 preliminary injunction hearing held before Magistrate Judge Muirhead.  Because this is a motion for summary judgment, I recite the facts in the light most favorable to Farrow, the non-moving party.

feathers at all times; (6) barring the various Native American nations represented within the Sacred Circle from meeting as sub-groups; (7) failing to employ a Native American consultant to shape the DOC's religious policies; and (8) denying him access to a sweat lodge[5] for ritual purification.

## A.   DOC Policies that Impact the Sacred Circle

To facilitate inmates' religious practices, the DOC drafted Policy and Procedure Directive 7.17 ("PPD 7.17"), which established guidelines for operating religious programs in New Hampshire's prison system.  PPD 7.17 was developed by DOC officials, including the prison system's chaplains, who consulted with representatives of various religious traditions, including members of the Native American community.  Prelim. Inj. Hr'g Tr. ("Tr.") at 51-56, 91-92.  The PPD was intended to provide inmates with  "the greatest amount of freedom and opportunity for pursuing [their] religious belief or practice" that is achievable given the DOC's need to maintain "security, safety, discipline

---

[5]  A sweat lodge is essentially a frame covered by tarps that is heated by fire.  Tr. at 14, 66-67.  In the Native American tradition, religious practitioners "go into the sweat lodge to be reborn, spiritually [and] emotionally."  Id. at 14. The sweat lodge also serves a purification function.  Id.

and the orderly operation of the institution."  PPD 7.17, IV.E.
Each religious group at NCF is provided a weekly two-hour block
for group worship and a separate weekly two-hour block for
religious education under the PPD.  Tr. at 73.  Inmates may
request additional programming time.  Id.

Attachment C to PPD 7.17 governs the issuance and control of
inmate religious property within DOC facilities.  Inmate property
is strictly regulated to minimize conflicts between inmates,
control contraband, promote cleanliness, and eliminate fire
hazards.  Id. at 47-50.  Inmate property regulations also enable
the DOC to exclude items that could be used as weaponry or as a
means for escape.  Id. at 49.

New Hampshire law prohibits prison officials from using
state funds to support any particular religion (see N.H. Rev.
Stat. Ann. §§ 622:22-23), so inmates must rely on the support of
outside groups and volunteers to donate religious materials.  Tr.
at 95.  Defendants concede there have been periods of time when
few Native American donations have been received.  Id. at 146.
Defendants maintain that they continue to work with the DOC
chaplains to find outside Native American groups to donate
religious items.  Id. at 145.

**B.    Application of PPD 7.17**

Individual members of the Sacred Circle are allowed to possess a number of religiously significant items (in addition to the standard authorized property permitted by prison policy) including beaded necklaces, feathers, bandanas, a native choker, and a medicine bag that usually contains personal items. Feathers and medicine bags may be worn underneath clothing at all times.  In addition to these individually-owned items, the Sacred Circle as a group is permitted to have a number of other religiously significant items including sticks, beans, blankets, cedar, a cedar bark boat, cups, a dream catcher, dried corn, a drum, drum beaters, leather, a leather medicine wheel, mandellas, native blue corn, a partial hawk wing, pictures, a pipe bundle, prayer flags, song books, and talking sticks.  The prison chaplain holds these items and makes them available to the group during communal gatherings.  Id. at 35-40.

Sacred Circle members may use the herb blend kinniknick, sage, and sweet grass.  Id. at 64, 127.  They are not, however, allowed to have the following herbs in their pure forms: tobacco, desert sage, cedar, juniper, bitteroot, osha root, pinion, red willow bark, bearberry leaf, Indian perfume,

-6-

lavender, marshmallow root, mullein leaf, peppermint leaf,
spearmint leaf, valerian root, wild cherry bark, yerba santa,
anise seeds, balsam and chamomile.[6]  Compl. Attach. 1; Newell
Aff. at 1, Pl.'s Ex. 2, Hr'g on Prelim. Inj ("Newell Aff.").

In addition to their weekly two-hour blocks for group
worship and religious education, members of the Sacred Circle may
participate in four feasts per year.  Tr. at 36.  They may pray
daily by themselves or with other Sacred Circle members during
free time.  Id. at 41.

The DOC does not have a sweat lodge at any of its
facilities, id. at 64, and it is unwilling to allow members of
the Sacred Circle to build one.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

---

[6] Many of these herbs are used as ingredients in kinniknick.
Tr. at 127.

56(c).  A genuine issue is one "that properly can be resolved
only by a finder of fact because [it] may reasonably be resolved
in favor of either party."  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 250 (1986).  A material fact is one "that might affect
the outcome of the suit."  Id. at 248.

         In ruling on a motion for summary judgment, I construe the
evidence in the light most favorable to the nonmovant.  See
Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).  The
party moving for summary judgment "bears the initial
responsibility of . . . identifying those portions of [the
record] which it believes demonstrate the absence of a genuine
issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317,
323 (1986).  Once the moving party has met its burden, the burden
shifts to the nonmovant to "produce evidence on which a
reasonable finder of fact, under the appropriate proof burden,
could base a verdict for it; if that party cannot produce such
evidence, the motion must be granted."  Ayala-Gerena v. Bristol
Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex,
477 U.S. at 323; Anderson, 477 U.S. at 249).  Neither conclusory
allegations, improbable inferences, nor unsupported speculation
are sufficient to defeat summary judgment.  See Carroll v. Xerox

-8-

<u>Corp.</u>, 294 F.3d 231, 236-37 (1st Cir. 2002), <u>citing</u> <u>J. Geils Band</u>

<u>Employee Benefit Plan v. Smith Barney Shearson, Inc.</u>, 76 F.3d

1245, 1251 (1st Cir. 1996).


### IV.  <u>ANALYSIS</u>

Farrow alleges that defendants are violating his rights

under RLUIPA, the First Amendment's Free Exercise Clause and the

Fourteenth Amendment's Equal Protection Clause.  I begin with

Farrow's RLUIPA claims.

**A.  <u>RLUIPA</u>**

     1.  <u>Statutory Interpretation</u>

Section 3 of RLUIPA, which addresses religious practices by

inmates, provides in relevant part:

> (a) General Rule.  No government shall impose a
> substantial burden on the religious exercise of a
> person residing in or confined to an institution, as
> defined in [section 1997 of this title], even if the
> burden results from a rule of general applicability,
> unless the government demonstrates that imposition of
> the burden on that person --
>
> > (1) is in furtherance of a compelling
> > governmental interest; and
> >
> > (2) is the least restrictive means of
> > furthering that compelling governmental

interest.[7]

42 U.S.C. §2000cc-1(a).  The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); see Civil Liberties for Urban Believers v. Chicago, 342 F.3d 752, 760 (7th Cir. 2003), cert. denied, 541 U.S. 1096 (2004).

To prevail on a claim under Section 3 of RLUIPA, a prisoner must establish a *prima facie* case that the challenged policy or regulation imposes a substantial burden on his exercise of religion.  See Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005).  If the prisoner makes this *prima facie* showing, the burden shifts to prison officials to demonstrate that the policy or regulation furthers a compelling governmental interest by the least restrictive means.  Id. at 995; see also 42 U.S.C. § 2000cc-2(b).

Neither the Supreme Court nor the First Circuit has had occasion to interpret the term "substantial burden," and the

_____

[7]  Section 3 of RLUIPA applies to state prisons that accept federal funds.  See 42 U.S.C. § 2000cc-1(b)(1).  Defendants concede that the DOC accepts federal funds and is subject to RLUIPA.  Tr. at 35.

circuit courts that have done so are in disagreement.  The Eighth

Circuit requires significant infringement on a "central tenet" or

fundamental activity of religious practice.  <u>Murphy v. Mo. Dep't

of Corrections</u>, 372 F.3d 979, 988 (8th Cir. 2004), <u>cert.</u> <u>denied</u>,

125 S. Ct. 501 (2004); <u>see also</u> <u>Gordon v. Pepe</u>, No. 00-10453-RWZ,

2004 U.S. Dist. LEXIS 16807 at *12-13 (D. Mass. Aug. 24, 2004);

<u>Ulmann v. Anderson</u>, No. 02-405-JD, 2004 U.S. Dist. LEXIS 7119 at

*24 (D.N.H. Apr. 26, 2004); <u>Farrow v. Stanley</u>, No. 02-567-B, 2004

U.S. Dist. LEXIS 1518 at *28 (D.N.H. Feb. 5, 2004).  Other

circuits disavow the central tenet requirement.  The Fifth

Circuit, for example, concluded that

> [A] government action or regulation creates a
> "substantial burden" on a religious exercise if it
> truly pressures the adherent to significantly modify
> his religious behavior and significantly violates his
> religious beliefs. . . . [T]he effect of a government
> action or regulation is significant when it either (1)
> influences the adherent to act in a way that violates
> his religious beliefs, or (2) forces the adherent to
> choose between, on the one hand, enjoying some
> generally available, non-trivial benefit, and, on the
> other hand, following his religious beliefs. . . . We
> emphasize that no test for the presence of a
> "substantial burden" in the RLUIPA context may require
> that the religious exercise that is claimed to be thus
> burdened be central to the adherent's religious belief
> system.

<u>Adkins v. Kaspar</u>, 393 F.3d 559, 570 (5th Cir. 2004), <u>cert.</u>

denied, 125 S.Ct. 2549 (2005); accord Konikov v. Orange County,
410 F.3d 1317, 1323 (11th Cir. 2005)("[A] 'substantial burden'
must place more than an inconvenience on religious exercise; a
'substantial burden' is akin to significant pressure which
directly coerces the religious adherent to conform his or her
behavior accordingly.  Thus, a substantial burden can result from
pressure that tends to force adherents to forego religious
precepts or from pressure that mandates religious conduct.")
(quoting Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d
1214, 1227 (11th Cir. 2004)); San Jose Christian College v. City
of Morgan Hill, 360 F.3d 1024, 1035 (9th Cir. 2004)(A substantial
burden "imposes a 'significantly great' restriction or onus upon
[religious] exercise."); Civil Liberties for Urban Believers, 342
F.3d at 761 (A substantial burden "bears direct, primary, and
fundamental responsibility for rendering religious exercise . . .
effectively impracticable.").

Although the circuits have split, the better reasoned view
is that the "substantial burden" requirement does not turn on the
centrality of a particular religious practice to the plaintiff's
religion.  To hold otherwise disregards RLUIPA's definition of
"religious exercise," which expressly protects practices that are

-12-

not central to a practitioner's religious beliefs.  Thus, I
conclude that a prison policy substantially burdens religious
exercise under RLUIPA if it coerces the inmate to modify his
religious behavior significantly or to violate his religious
beliefs.

    2.  <u>Application</u>

    Farrow makes eight specific claims.  Defendants respond by
arguing that the DOC's policies do not impose a substantial
burden on Farrow's religious practice.  Alternatively, they
contend that all of the policies are justified because they
further compelling governmental interests by the least
restrictive means available.  I address each of Farrow's specific
claims in turn.

         **a.  Access To Tobacco**

    Farrow claims that defendants are denying him access to
tobacco.  Compl. ¶ 18.  He asserts that he needs tobacco to
perform "prayer ties, prayer flags, offerings to mother earth,
and all creation, along with drum offerings, and . . .
ceremonies," all of which are important to the practice of his
religion.  Pl.'s Memo. in Supp. Obj. Summ. J. ¶ 2.  He asserts
that kinniknick, the tobacco substitute offered by defendants, is

unacceptable because he believes that "his creator will look upon him poorly should he use a tobacco free product." Id. ¶ 6.  In fact, Farrow charges, asking him to accept this substitute is "more than a substantial burden, it is spiritual death."  Id.

Defendants counter that kinniknick is an acceptable substitute for Sacred Circle ceremonies and other religious purposes.  All DOC facilities are tobacco-free, and prison officials reached the decision to use kinniknick as a tobacco substitute after they consulted with several members of the Native American community.  Tr. at 115-16.  Kinniknick, which is available commercially, is sold both with and without tobacco. Prison policy does not prohibit inmates from using kinniknick with "some tobacco in it."  Tr. at 64.  Farrow states that "a tobacco mix of kinniknick would be good enough for [religious purposes]."  Pl.'s Memo. in Supp. Obj. Summ. J. ¶ 13. Accordingly, because defendants permit the use of kinniknick with traces of tobacco, they do not force Farrow to violate his religious beliefs or to depart significantly from his religious traditions.  Defendants' system-wide prohibition of pure tobacco thus does not impose a substantial burden on Farrow's religious exercise, and I grant defendants' motion for summary judgment as

to this claim.

### b.   Access To Medicines And Herbs

Farrow next complains that defendants do not permit him to possess traditional medicines and herbs necessary to practice his religion.  Compl. ¶ 78.  Farrow submitted two long lists of herbs, but failed to explain why those herbs are important to Native American religious practice.  Newell Aff. at 1; Compl. Attach. 1.  At the preliminary injunction hearing, Farrow testified that several of the herbs are used to prevent sore throats, to make teas, or to produce saliva during sweat lodge ceremonies.  Tr. at 6-9.  He has failed, however, to adequately explain why these herbs' are religiously significant.  Likewise, Chaplain Shaulis testified that although many of the herbs Farrow requested have medicinal value, they do not have religious value. Id. at 121-22.  Shaulis explained that he developed the list of permissible herbs such as sage, sweet grass and kinniknick after he consulted with Native American practitioners.  Although other herbs may have ceremonial purposes, he concluded that they are not necessary for religious practice.  Id. at 122-24.  In further defense of the DOC's policy, defendants explained that several of the prohibited herbs can be physically harmful and even fatal if

-15-

used incorrectly.  Id. at 69-70, 120-22.

Farrow has not made a *prima facie* showing that defendants'
unwillingness to provide him with the prohibited herbs coerces
him to significantly modify his religious behavior or to violate
his religious beliefs.  I therefore grant defendants' motion as
to this claim.

### c.   Daily Communal Prayer

Farrow also alleges that his religion requires daily
communal prayer, which prison officials do not allow.  Compl. ¶
36.  Prison policy permits members of each of NCF's faith groups,
including the Sacred Circle, one weekly two-hour block for group
worship and one weekly two-hour block for religious education.
Tr. at 40.  Farrow has not explained why daily group prayer is
necessary or why weekly group prayer is inadequate.  Moreover,
Chaplain Shaulis testified that although daily prayer is itself
essential, daily *group* worship is not.  Tr. at 124.  Farrow
concedes that he is permitted to pray with other Sacred Circle
members during free time and to pray daily in his cell.  Id. at
41.

Farrow has not presented sufficient credible evidence to
show that defendants' refusal to provide daily group prayer to

-16-

Sacred Circle members substantially burdens his religious exercise.  I therefore grant defendants' motion for summary judgment as to this claim.

### d.    Traditional Foods And Special Religious Days

Farrow complains that he is being denied traditional Native American foods, particularly buffalo meat, which he needs to properly celebrate major religious holidays.  Compl. ¶ 57 & Attach. 3.  He maintains that buffalo meat was formerly available but is now banned.  Farrow claims that Sacred Circle members are willing to pay for buffalo meat and other traditional foods for four annual festivals sanctioned and sponsored by NCF officials.  Tr. at 17-19.

Chaplain Shaulis testified that the foods traditionally prepared for Native American holidays depend upon the foods available during a particular season and in a particular region.  Id. at 128.  Moreover, Farrow admitted that many traditional foods, such as squash and corn, are prepared and served at NCF.  Id. at 41.  Defendant Young testified that she consults with the various NCF religious groups about the development of feasts for religious holidays.  Id. at 149-50.  When a feast menu has been designed, she presents it to the prison chef so that the kitchen

-17-

staff can prepare the meal.  Id. at 151.

More important, Farrow has not explained why any specific foods are a significant part of his religious practice.  The only connection he made between traditional foods and religious exercise was at the preliminary injunction hearing, when he testified that "when people properly prepare themselves to eat these foods, these foods impart positive attributes to those who eat and take part in these meals."  Id. at 17.  This showing is insufficient to demonstrate that eating specific foods is an important component of Farrow's religious practice.  At best, it indicates that *preparation* for consumption, rather than consumption itself, has religious significance.  This suggests that the substitution of other foods is not a substantial burden on Farrow's religious exercise.

Farrow has not presented sufficient credible evidence that defendants' refusal to provide him with traditional foods has substantially burdened his religious exercise.  I therefore grant defendants' motion as to this claim.

### e.    Permission To Wear Feathers At All Times

Farrow next complains that DOC policy prohibits him from wearing feathers on the outside of his clothing except during

-18-

ceremonies, and that this policy prevents him from meaningfully practicing his religion.  Compl. ¶ 64.  Farrow asserts that wearing feathers in his hair keeps him safe, protects him from harm and reminds him of his connection to his creator.  Farrow Aff. ¶ 31.  The defendants agree that it is essential for Sacred Circle members to have feathers.  They dispute Farrow's contention that practitioners must *wear* the feathers.  Tr. at 131.  Farrow is permitted to use feathers in prayer and smudging ceremonies and to wear feathers inside of his clothing.  Id. at 42-43.  He has not explained how the prohibition on wearing feathers outside his clothing, in addition to the uses that defendants permit, forecloses religious use of the feathers.

Farrow has not presented sufficient evidence that requiring him to conceal his feathers forces him to modify his religious practice significantly or to violate his religious beliefs.  Accordingly, I grant defendants' motion for summary judgment as to this claim.

### f.   Separate Meeting Times For Various Nations

Farrow complains that defendants do not allow the various tribal nations represented in the Sacred Circle group to meet separately.  Farrow Aff. ¶ 36.  He asserts that the different

nations need separate meetings to learn more about their religious traditions.  Farrow Aff. ¶¶ 32-34, 37.  Farrow also testified that members of different Native American tribes need separate meetings because they have different languages, ceremonies and songs.  Tr. at 29-30.  Defendants counter that the relatively small number of inmates in the Sacred Circle makes more than one group meeting impractical.[8]  They also argue that one meeting is sufficient because of the similarity of the different nations' religious practices.  Id. at 75.

Farrow has not provided evidence that defendants' refusal to allow separate meetings has limited his *own* religious practice in any way.  Accordingly, he has not made a *prima facie* case that his religious practice is substantially burdened by the DOC policy.  I therefore grant defendants' motion for summary judgment as to this claim.

### g.   Retention of a Native American Consultant

Farrow next demands that the DOC retain a Native American consultant to oversee prison policy, focusing specifically on

---

[8]  Chaplain Shaulis testified that there are approximately 65 declared Sacred Circle followers in the DOC system, and only 12 of those are incarcerated at NCF.  Tr. at 100.

important Native American religious practices.  Compl. ¶ 43. As
one of two chaplains, Chaplain Shaulis ministers to all
religions.  Tr. at 96.  He has worked on two different Native
American reservations, id. at 89, and consults with outside
experts in formulating Native American religious policy.  Id. at
91-92.  Farrow has not shown that the absence of a Native
American consultant has burdened his religious practice in any
way; in fact, Chaplain Shaulis is more knowledgeable about Native
American religious traditions than might be expected.[9]
Defendants' motion for summary judgment as to this claim is
granted.

### h.  Sweat Lodge

Lastly, Farrow complains that defendants have refused to
allow Sacred Circle members to construct a sweat lodge at NCF.
Compl. ¶ 29.  Farrow explains that the sweat lodge ceremony is an
"integral part" of his religious practice, Farrow Aff. ¶ 15, and
describes it as the "most important component of the Lakota

---

[9]  Chaplain Shaulis has Native American heritage.  He
testified that his great-grandmother is a full-blooded Cree and
his grandfather is an Abenaki.  Shaulis explained that he gained
additional insights into Native American religious practices
while serving in the military on the Blackfoot and Assinaboine
reservations.  Tr. at 89.

religion." Pl's Memo. in Supp. Obj. Summ. J. ¶ 9.  Penobscot

Elder Donald Newell's affidavit also supports this position.

Newell Aff. at 2.  Although defendants acknowledge that a sweat

lodge is a "very important function" for followers of the Lakota

tradition, Tr. at 118, and defendant Susan Young indicated in her

August 5, 2002 letter that the DOC was "reviewing the

appropriateness of constructing Sweat Lodges," prison officials

ultimately denied Farrow's request.

Defendants argue that denying Farrow access to a sweat lodge

does not substantially burden his religious exercise because

community smudging and weekly community prayer meetings, which

include a pipe ceremony, provide adequate alternative means by

which Farrow can meaningfully practice his religion.[10]  I

disagree in large part because Chaplain Shaulis's testimony at

---

[10]  Defendants rely on Trapp v. DuBois, CA95-0779B, 2000
Mass. Super. LEXIS at 259 (Mass. Super. Ct. May 8, 2000) for the
proposition that a sweat lodge is unnecessary because inmates who
are Sacred Circle members may perform pipe ceremonies and
smudging.  This reliance is misplaced.  Although the
Massachusetts Superior Court in Trapp denied the plaintiffs'
request for a sweat lodge, the Massachusetts Court of Appeals
subsequently recommended that the parties commence settlement
discussions.  In March 2003, the parties agreed to settle, after
which the appeals court entered an order approving joint
stipulation of dismissal.  Trapp v. DuBois, 1995-0779, 2003 Mass.
Super. LEXIS 436 at *2 (Mass. Super. Ct. December 10, 2003).

the preliminary injunction hearing effectively undermines defendants' argument.  Shaulis testified that for some Native American tribes "the sweat lodge [ceremony] would be considered a cornerstone" and "for the Lakota it would be a very important function, almost as important as the sun dance."  Tr. at 118. Shaulis further testified that there are no other methods or ceremonies that could replace the sweat lodge ceremony's purification and detoxification functions.  Id. at 119.  The DOC's outright prohibition on sweat lodges makes it impossible for Farrow to participate in this particular religious ritual.  I thus conclude that Farrow has presented sufficient credible evidence to show that denying him access to a sweat lodge requires him to modify his religious behavior significantly and therefore substantially burdens his religious exercise.

Because Farrow has made a *prima facie* case, defendants must demonstrate that their refusal to permit a sweat lodge furthers a compelling governmental interest by the least restrictive means available.  See 42 U.S.C. § 2000cc-1(a)(2).  Warden Cattell testified in an effort to satisfy this standard that a sweat lodge is a "significant security problem" because it requires a sacred space in which non-believers are not permitted to enter,

-23-

making it difficult for NCF officials to conduct searches of the area.  Tr. at 65.  Furthermore, because the sweat lodge is covered by tarps, prison officials have difficulty monitoring conduct inside the lodge.  Id. at 66-68.  This lack of supervision could create opportunities for violence and other inappropriate conduct inside the sweat lodge.  Id. at 68.

Warden Cattell also testified that the construction and operation of a sweat lodge would burden prison resources.  He noted that the proposed sweat lodge site currently is used for outdoor functions both by the Sacred Circle and by other religious groups.  Id. at 67.  Construction of a sweat lodge would preclude use of the space by other groups.  Id.  Shaulis corroborated this testimony, explaining that a sweat lodge would require "a sacred space of at least 40 feet by 40 feet . . . not open to dual use, so it would not be open to any other groups." Id. at 117.

In addition, Cattell pointed out the need for fire wood for the sweat lodge, which would have to be split at NCF or shipped, pre-cut, into the facility.  Id. at 65.  He testified that in his experience inmates cannot afford pre-cut wood, so uncut logs would have to be delivered to the prison.  Id.  Prison officials

-24-

would have to ensure that the person delivering the wood had
security clearance to enter the facility, inspect the shipment,
and supervise the crew using restricted tools to split the
firewood.  Id. at 65-66.

Farrow responds that as many as thirty other prisons
maintain and operate sweat lodges, indicating that defendants'
safety and security concerns may be exaggerated.[11]  He testified
that inmates could be searched prior to entering and before
exiting the area.  Id. at 15-16.  Farrow suggested that NCF could
use Native American security guards already employed by the DOC
to supervise sweat lodge ceremonies.  Id. at 16.  Finally, Farrow

---

[11]  In addition to Trapp, defendants cite five other cases
in which courts concluded that prisons need not allow sweat
lodges.  At the preliminary injunction hearing, Farrow properly
distinguished two of these cases on their facts.  Tr. at 12.  In
both Hamilton v. Schriro, 74 F.3d 1545 (8th Cir. 1996) and Allen
v. Toombs, 827 F.2d 563 (9th Cir. 1987), the prisoners who sought
access to a sweat lodge were incarcerated in maximum security
facilities, in which the security concerns and risk of security
breaches were higher than at NCF.  Notably, in Allen the court
recognized that inmates in the general population were permitted
to participate in weekly sweat lodge ceremonies.  827 F.2d at 565
n.5.  Likewise, in McElhaney v. Elo, 202 F. 3d 269 at *3(6th Cir.
2000)(unpublished table opinion), another case cited by
defendants, Michigan prison guidelines prohibited sweat lodge
access only to those inmates in the three highest security
classifications.

identified two potential Sacred Circle volunteers, who currently
visit prisons in Massachusetts and Connecticut, who might be
available to oversee the ceremonies.  Pl.'s Memo. in Supp. Obj.
Summ. J. ¶ 11.  Whether either of these suggestions is feasible,
however, remains unclear.

Without a doubt, "prison security is a compelling state
interest and . . . deference is due to institutional officials'
expertise in this area."  Cutter, 125 S. Ct. at 2124 n. 13.  But
prison officials "cannot merely brandish the words 'security' and
'safety' and expect that their actions will automatically be"
insulated from scrutiny.  Campos v. Coughlin, 854 F. Supp. 194,
207 (S.D.N.Y. 1994); see also Werner v. McCotter, 49 F.3d 1476,
1480 (9th Cir. 1995) ("'[T]he state must do more than simply
offer conclusory statements that a limitation on religious
freedom is required for security, health or safety to establish
that its interests are [compelling].'") (quoting Weaver v. Jago,
675 F.2d 116, 119 (6th Cir. 1982).  At this early stage, the
record is insufficiently developed for me to award judgment as a
matter of law to either party.  An evidentiary hearing will flesh
out the factual context, with further inquiry into the
requirements for constructing and operating a sweat lodge, the

potential for satisfactory alternatives, and the defendants'
ability to maintain security and orderliness in a facility that
includes a sweat lodge.

Genuine issues of material fact exist as to whether
defendants' decision to deny Farrow access to a sweat lodge
violates his rights under RLUIPA.  Accordingly, summary judgment
on this issue is inappropriate.

**B.   <u>Free Exercise Clause</u>**

Farrow alternatively argues that the DOC is violating his
right to practice his religion under the First Amendment's Free
Exercise Clause.  To establish a Free Exercise Clause violation,
Farrow must demonstrate both that defendants have imposed "a
substantial burden on the observation of a central religious
belief or practice," <u>Hernandez v. Commissioner</u>, 490 U.S. 680, 699
(1989), and that the defendants' conduct is not "'reasonably
related to legitimate penological interests,'"
<u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 349 (1987) (<u>quoting</u>
<u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)); <u>see</u> <u>also</u> <u>Overton v.</u>
<u>Bazzetta</u>, 539 U.S. 126, 132 (2003) (allocating burden of proof).

The Free Exercise Clause's substantial burden requirement is
more difficult to satisfy than its counterpart under RLUIPA in

-27-

part because, unlike RLUIPA, the Free Exercise Clause requires that defendants' conduct must substantially burden one or more of the plaintiff's *central* religious beliefs or practices.  <u>Compare</u> <u>Hernandez</u>, 490 U.S. at 699 (Free Exercise Clause) <u>with</u> <u>Adkins</u>, 393 F.3d at 570 (RLUIPA).  Accordingly, my determination that none of Farrow's claims except his sweat lodge claim satisfy RLUIPA's substantial burden test necessarily means that his corresponding claims under the Free Exercise Clause are also deficient.  Further, although the difference between the two tests leaves open the possibility that a claim that satisfies RLUIPA's substantial burden requirement nevertheless may fail under the Free Exercise Clause, Farrow's sweat lodge claim is not subject to this fate because participation in the sweat lodge ceremony is a central part of Farrow's religious practice.  Thus, I turn to the second part of the Free Exercise Clause test to determine whether Farrow's sweat lodge claim is viable.

Several factors ordinarily are considered in determining whether a prison practice is reasonably related to a legitimate penological interest.  As a threshold matter, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."

Turner, 482 U.S. at 89.  If this requirement is met, other

factors become potentially relevant.  These include:

(1) the extent to which other means are available to the inmate

to practice his religion; (2) the impact that accommodation of

the inmate's request will have on "guards and other inmates, and

on the allocation of prison resources generally;" and (3) the

availability of alternatives "that fully accommodate the

prisoner's rights at de minimis cost to valid penological

interests."  Id. at 89-91.  A "court is not required to weigh

evenly, or even consider explicitly, each of the four Turner

factors."  Spies v. Voinovich, 173 F.3d 398, 403 (6th Cir. 1999).

Although Farrow's Free Exercise Clause claim is

substantially weaker than his RLUIPA claim because both the

burden of proof and the legal standard that govern the Free

Exercise Clause claim are more favorable to the defendants, I

nevertheless conclude that defendants are not entitled to summary

judgment on the sweat lodge claim because facts material to the

resolution of the claim remain in genuine dispute.  In

particular, I need to know whether Farrow is correct in claiming

that the DOC has a sufficient number of Native American prison

guards who could monitor sweat lodge ceremonies without

compromising their religious significance.  I also need to better
understand whether the DOC's security needs could be satisfied if
such guards were available to monitor sweat lodge ceremonies.
Accordingly, I deny defendants' motion for summary judgment as to
this claim.

## C.   **Equal Protection**

Farrow's third claim is that defendants are violating his
Fourteenth Amendment right to equal protection by discriminating
against him on the basis of his religion.  In particular, he
challenges the DOC's policies on feathers, group meeting times
and requests for traditional foods.  I discuss each claim in turn
after briefly describing the legal standard that governs the
equal protection claim.

### 1.   The legal standard

To establish an equal protection claim, a plaintiff must
demonstrate that he is intentionally being treated differently
from other similarly situated individuals without sufficient
justification.  See Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir.
2004).  Religious discrimination claims ordinarily are subject to
rational basis review unless the plaintiff can establish that the
alleged discrimination also violates his rights under the Free

Exercise Clause.  <u>Wirzburger v. Galvin</u>, 412 F.3d 271, 282 (1st
Cir. 2005).

### a.  Feathers

Farrow may carry feathers on his person at all times, but
prison regulations prohibit him from wearing feathers outside of
his clothing except during religious ceremonies.  Tr. at 42-43,
74.  Although Farrow testified that inmates of other faiths may
"wear head gear" except during security checks, <u>id.</u> at 20-21, the
prison's feather policy is consistent with regulations applicable
to other religious items, for example Christian inmates must wear
medallions inside their shirts when they are outside their cells.
<u>Id.</u> at 43.  Farrow's allusion to "head gear," without explanation
of how feathers are similar to such head gear, is insufficient to
make out an equal protection claim.  Rather, the testimony about
Christian medallions shows that Sacred Circle members are treated
the same as other religious practitioners.  Defendants' motion
for summary judgment as to this claim is granted.

### b.  Separate Meeting Times for Different Nations

Farrow next alleges that Christian inmates may "break into
all its denominations [sic]" whereas the Sacred Circle is not
permitted to have different worship and education meetings for

the members of different tribal nations.  Tr. at 29-30.  The
prison's schedule for religious observance shows that this is
simply not the case.  While there are separate services for
Catholics and Protestants,[12] there are not individual meeting
times for the various Protestant denominations.  <u>See</u> Def.'s Ex.
D.  Farrow has not shown that he is treated differently than
other inmates who wish to worship in a group setting; all have
limited opportunity for narrowly-tailored religious services.
Moreover, Farrow has not shown that defendants have structured
the worship schedule based on an impermissible motive.  In fact,
defendant Young testified that although religious groups
generally must have a volunteer facilitator, the Sacred Circle is
permitted to meet without one because of the difficulty in
securing volunteers.  Tr. at 145.  Defendants' motion for summary
judgment as to this claim is granted.

### c.  Traditional Native American Foods

Finally, Farrow has made an equal protection argument
regarding the availability of traditional Native American foods.

------

[12] The schedule actually refers to "Christian Services," as
distinguished from "Catholic Services."  I understand "Christian
Services" to mean Protestant services.

He has not alleged any facts, however, showing that prison officials treat other faith groups differently than they treat the Sacred Circle with regard to food.  I therefore grant defendants' motion for summary judgment as to this claim.

**D.   <u>Qualified Immunity</u>**

Farrow has sued the defendants in their individual capacities for money damages.[13]  Defendants argue that they are qualifiedly immune from such claims.  I agree.[14]

---

[13]  Farrow does not specify whether his request for money damages stems only from his constitutional claims (which, with the exception of the sweat lodge claim, have proven unsuccessful) or from his alleged RLUIPA violations.  RLUIPA authorizes "appropriate relief against a government." 42 U.S.C. § 2000cc-2. There is substantial uncertainty, however, as to whether this language even provides a right to money damages.  These issues have not been briefed by the parties, and I decline to address them here.  Accordingly, I deny without prejudice defendants' motion for summary judgment seeking qualified immunity from RLUIPA-based damages.  If Farrow is in fact seeking damages for violations of RLUIPA, he shall file a notice with this court within 10 days.  Defendants shall then be free to move for summary judgment challenging his claim for damages under RLUIPA on grounds including (1) that there is no express or implied private right of action for damages under RLUIPA; (2) that RLUIPA violations are not cognizable under 42 U.S.C. § 1983; and (3) even if RLUIPA violations are cognizable under § 1983, defendants are nonetheless entitled to qualified immunity.

[14]  Because I have granted summary judgment at the liability stage on Farrow's other free exercise claims, I need only address qualified immunity with respect to the sweat lodge issue.

"[T]he doctrine of qualified immunity protects public officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The First Circuit uses a three-part test based on Supreme Court jurisprudence for determining whether a public official is entitled to qualified immunity.  Courts must ask: "(i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).

"[W]hen performing the first prong of the analysis, it is generally inadequate to state [the constitutional right as] a very generalized proposition." Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 62 (1st Cir. 2004).  For example, I should not frame the right in dispute as the constitutional right to the free exercise of religion.  See id.  At the same time, courts must

-34-

avoid "construing the relevant rights/rules with such specificity that the predictably scant jurisprudence on point would never satisfy the 'clearly established' threshold [of the second prong]." Acevedo-Garcia v. Monroig, 351 F.3d 547, 564 (1st Cir. 2003).

The outcome of the qualified immunity inquiry often "'depends substantially upon the level of generality'" with which the constitutional right is described in the first prong of the analysis. Id. (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)). This is not such a case. Even when the constitutional right is defined quite narrowly, there is an abundant body of case law on point because "[t]he issue of the right of inmate practitioners of the Native American religion to have access to a sweat lodge has been the subject of widespread and pervasive litigation over the past [fifteen years]." Youngbear v. Thalacker, 174 F. Supp. 2d 902, 906 (N.D. Iowa 2001). Accordingly, I conclude that the appropriate question in the first prong of the qualified immunity analysis is whether an inmate has a free exercise right to make use of a sweat lodge. I decline to answer that question because I have determined that a hearing is appropriate to flesh out the factual context of

-35-

Farrow's sweat lodge claim.[15]

Assuming an inmate does have a constitutional right to
participate in the sweat lodge in certain circumstances, the
second prong of the qualified immunity analysis dictates that I
determine whether or not that right was clearly established at
the time it was violated.  In order to make this determination, a
"court must canvass controlling authority in its own jurisdiction
and, if none exists, attempt to fathom whether there is a
consensus of persuasive authority elsewhere."  Savard v. R.I.,

---

[15]  Courts generally should take the three prongs of the
qualified immunity analysis sequentially, so as to achieve
"proper development of the law of qualified immunity."  Limone,
372 F.3d at 44.  This rule, which follows the Supreme Court's
decision in Saucier v. Katz, 533 U.S. 194 (2001), "is not
completely inflexible."  Riverdale Mills, 392 F.3d at 62.
Sometimes, the "law elaboration function" of the sequential
analysis will not be appropriate, "such as where the claim
depends on a 'kaleidoscope of facts not yet fully developed.'"
Id. (quoting Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69-
70 (1st Cir. 2002)); see also Brosseau v. Haugen, 125 S. Ct. 596,
600-1 (2004) (Breyer, J., concurring) (expressing doubt about the
validity of a rigid sequential analysis); Ehrlich v. Town of
Glastonbury, 348 F.3d 48, 57 (2d Cir. 2003) (explaining that
courts must "use their good sense and limit [the sequential
analysis] to those cases where it was meant to apply").  Because
I have determined that further factual development will be useful
on the issue of whether or not there has been a constitutional
violation, this is a case where it is appropriate to skip
directly to the second prong of the analysis.  Elaboration of the
law is not avoided, but merely delayed.

338 F.3d 23, 28 (1st Cir. 2003).  <u>Accord</u> <u>Wilson v. Layne</u>, 526

U.S. 603, 617 (1999); <u>Brady v. Dill</u>, 187 F.3d 104, 116 (1st Cir.

1999).  As there is no controlling First Circuit decision on

point, I must examine case law from other jurisdictions.

A number of the nation's state and federal prisons provide

Native American inmates with access to a sweat lodge.  <u>See, e.g.</u>,

<u>Henderson v. Terhune</u>, 379 F.3d 709, 711 (9th Cir. 2004)

(California state prisons permit sweat lodges); <u>Allen v. Toombs</u>,

827 F.2d 563, 565 n.5 (9th Cir. 1987) (sweat lodge ceremony held

once a week in Oregon state prison, but high security inmates not

allowed to participate); <u>Brown v. Schuetzle</u>, 368 F. Supp. 2d

1009, 1012 (D.N.D. 2005) (sweat lodges have operated in North

Dakota state prisons since 1978); <u>Runningbird v. Weber</u>, No. 03-

4018-RHB, 2005 WL 1363927 at *1 (D.S.D. June 8, 2005) (sweat

lodge ceremony provided in South Dakota state prison);

<u>Greybuffalo v. Bertrand</u>, No. 03-C-559-C, 2004 U.S. Dist. LEXIS

22356 at *9 (W.D. Wis. November 1, 2004) (monthly sweat lodge

ceremony available in Wisconsin state prison); <u>Crocker v. Durkin</u>,

159 F. Supp. 2d. 1258, 1264 (D. Kan. 2001) (sweat lodge available

in Leavenworth U.S. Penitentiary); <u>Indian Inmates of Nebraska</u>

<u>Petitentiary v. Grammar</u>, 649 F. Supp. 1374, 1376 (D. Neb. 1986),

<u>aff'd</u>, 831 F.2d 301 (8th Cir. 1987) (sweat lodge available in Nebraska state prison since 1976).  Further, at least one federal district court has determined that prisoners have a Free Exercise Clause right to a sweat lodge.  <u>See</u>, <u>e.g.</u>, <u>Youngbear</u>, 174 F. Supp. 2d at 915 (one-year delay in construction of a sweat lodge, when it could have been built promptly, violated inmates' free exercise rights).

On the other hand, several courts have determined that the Free Exercise Clause does not require prisons to provide sweat lodge ceremonies for Native American religious practitioners. <u>See, e.g.</u>, <u>Hamilton</u>, 74 F.3d at 1551 (sweat lodge not required under Free Exercise Clause[16]); <u>Wilson v. Moore</u>, 270 F. Supp. 2d 1328, 1353 (N.D. Fla. 2003) (same); <u>Gonzalez v. Litscher</u>, 230 F. Supp. 2d 950, 960 (W.D. Wis. 2002), <u>aff'd</u>, 79 Fed. Appx. 215 (7th Cir. 2003) (unpublished) (sweat lodge not required, at least for maximum security inmates, under Free Exercise Clause); <u>Tart v. Young</u>, 168 F. Supp. 2d 590, 594 (W.D. Va. 2001) (sweat lodge not required under Free Exercise Clause).

---

[16]  Despite this decision, a sweat lodge has subsequently been built at the prison in question in <u>Hamilton</u>.  <u>Pounders v. Kemper</u>, 79 Fed. Appx. 941, 943 n.2 (8th Cir. 2003) (unpublished).

The case law is sufficiently unsettled for me to conclude that there is no consensus of authority as to a prisoner's right to make use of a sweat lodge.[17]  Therefore, the right is not clearly established and defendants are qualifiedly immune from Farrow's claim for damages.[18]  <u>See</u> <u>Thomas v. Gunter</u>, 103 F.3d 700, 703 (8th Cir. 1997) (prison officials entitled to qualified immunity with regard to inmate's request for increased access to prison sweat lodge); <u>Wilson</u>, 270 F. Supp. 2d. at 1355 (prison officials qualifiedly immune as against prisoner's free exercise claim to a sweat lodge); <u>Youngbear</u>, 174 F. Supp. 2d at 920 (even though defendants' one-year delay in constructing a sweat lodge violated inmates' free exercise rights, defendants were entitled to qualified immunity).

For the above-described reasons, I find that defendants are

---

[17]  The First Circuit has also noted that where the existence of a right depends on the outcome of a balancing test, the right will generally not be clearly established, "'at least in the absence of closely corresponding factual or legal precedent.'" <u>Fabiano v. Hopkins</u>, 352 F.3d 447, 457 (1st Cir. 2003) (<u>quoting</u> <u>Frazier v. Bailey</u>, 957 F.2d 920, 931 (1st Cir. 1992)).

[18] Because I have determined that the constitutional right in question was not clearly established, I need not reach the third prong of the qualified immunity inquiry.

entitled to qualified immunity from Farrow's claim for money damages, and defendants' motion for summary judgment as to this claim is granted.

## V. <u>CONCLUSION</u>

For the above-described reasons, I deny defendants' motion for summary judgment (Doc. No. 24) as to Farrow's request for access to a sweat lodge under RLUIPA and the Free Exercise Clause.  I also determine that defendants are entitled to qualified immunity with respect to Farrow's claim for damages under the Free Exercise Clause.  In all other respects, the motion is granted.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

October 20, 2005

cc:  Prayer Feather Farrow, *pro se*
     Michael K. Brown, Esq.